Jaymie Parkkinen (SBN 318394)
jparkkinen@taulersmith.com
Kiran Sekhon (SBN 360474)
ksekhon@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 1100
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff*
*Lawrence Schallert*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

LAWRENCE SCHALLERT, individually and on behalf of all others similarly situated,

Plaintiff,

v.

LAIRD SUPERFOOD, INC., a Nevada corporation; and DOES 1 through 25, inclusive,

Defendants.

Case No. 2:25-CV-12407-SPG-PVC

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

1. **VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW (CAL. PENAL CODE § 638.51)**
2. **VIOLATIONS OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT (CAL. PENAL CODE § 502)**
3. **INVASION OF PRIVACY**
4. **INTRUSION UPON SECLUSION**
5. **UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200 *et seq.*)**

**<u>ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF</u>**

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff Lawrence Schallert ("Plaintiff"), individually and on behalf of all others similarly situated, alleges as follows based on personal knowledge as to his own conduct and on information and belief as to all other matters:

## INTRODUCTION

1. Every day, millions of Californians browse the internet believing their curiosity is their own. They believe that when they explore questions about their health, their diet, or their wellbeing online, their activity remains private. Defendant Laird Superfood, Inc. ("Defendant") treated that private activity as a commercial opportunity.

2. Defendant presents itself as a health-and-wellness company. Consumers visit its website, www.lairdsuperfood.com (the "Website"), to read about nutrition, explore recipes, and learn about and purchase products designed to support their health. They arrive as consumers, but they leave as monetized data profiles.

3. Defendant embedded invisible code, including pixels, third-party cookies, and scripts provided by TikTok, Meta, Google, Snap, LiveRamp, and others (collectively, the "Tracking Software"), directly into the Website. The moment a consumer arrives, that software activates silently within the consumer's browser, capturing a digital record of the consumer and the consumer's visit, and transmitting it in real time to a network of advertising platforms, analytics companies, and data brokers—all without the consumer's knowledge or consent. While consumers can see a webpage about nutrition, they cannot see that identifying information about them and their device has already been routed to third parties before the page has finished loading.

4. The consequences of this system extend well beyond targeted advertising. Once data enters the digital surveillance ecosystem, it does not stay contained. It is aggregated, repackaged, and sold to marketers, to financial institutions, to political operatives, and to government agencies including U.S. Customs and Border Protection and Immigration and Customs Enforcement, which have used commercially obtained

browsing data to track individuals without a warrant. Indeed, Defendant's Tracking Software feeds data directly to third parties whose own data practices have drawn significant regulatory scrutiny—among them TikTok, fined €530 million in 2025 for unlawfully transferring user data to China. Consumers who visited the Website to learn about health foods did not agree to any of this.

5. The right to privacy in California is not a technicality. It is enshrined in the state's statutes, common law, and Constitution. Defendant violated this right at every level.

6. On April 2, 2025, Plaintiff Lawrence Schallert visited Defendant's Website while located in California. Without his knowledge or consent, Defendant's Tracking Software captured his data and transmitted it to third parties. Plaintiff brings this action on behalf of himself and those similarly situated to remedy these violations and to put an end to the covert surveillance Defendant built into every visit to its Website.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"). The proposed class contains more than 100 members, minimal diversity exists between the parties, and the amount in controversy exceeds $5,000,000 exclusive of interest and costs.

8. California's Invasion of Privacy Act ("CIPA") provides statutory damages of $5,000 per violation. Cal. Penal Code § 637.2. Publicly available web analytics estimate that Defendant's Website receives approximately 44,000 unique visitors per month, or more than 500,000 visits during a twelve-month period. Even assuming conservatively that only 84 of those monthly visitors were California residents during the one-year limitations period applicable to CIPA claims, the statutory damages attributable to those visits alone would exceed $5,040,000. This figure is calculated as approximately 1,008 California visits over a twelve-month period multiplied by $5,000 per violation. Eighty-four monthly California visitors

represent less than 0.2% of the Website's estimated monthly traffic. The amount in controversy therefore exceeds the jurisdictional threshold required under CAFA based on the trap and trace claim alone.

9. Defendant removed this action from the Superior Court of California to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

10. This Court has personal jurisdiction over Defendant because Defendant purposefully conducts substantial business activities directed toward California consumers. Defendant markets and distributes its products throughout California through an extensive network of retail outlets and commercial partnerships. Defendant's products are sold through more than 1,200 retail locations across California, including approximately 192 retail locations in the Los Angeles area alone. Defendant also promotes and advertises its products to California consumers through digital advertising campaigns and social media promotions targeting California consumers, and brand collaborations emphasizing the availability of Defendant's products in California retail locations. Through these activities, Defendant has cultivated a substantial market for its products within California.

11. Defendant also operates a highly interactive commercial website through which it directly markets and sells its products to consumers nationwide, including consumers located in California. The Website includes features designed to engage consumers and direct them to locations where Defendant's products are sold. These features include an interactive store locator that identifies retail locations carrying Defendant's products, provides contact information and directions to those stores, and allows consumers to view product availability information. Defendant also sells its products directly to consumers through the Website, including through subscription purchasing options that allow consumers to enroll in recurring product shipments. The Website also includes disclosures and policies directed specifically to California consumers. Through these features, Defendant deliberately uses the Website as a channel to cultivate and transact with California consumers.

12. In addition to these visible consumer-facing features, the Website operates through numerous scripts, tracking technologies, and other code that execute within a consumer's browser when the Website loads, generating multiple technical communications between the California consumer's device and the Website's servers and third-party platforms during the course of the visit.

13. As part of its marketing and advertising operations, Defendant embedded the Tracking Software into its Website. The Tracking Software automatically executes within the web browsers of consumers who access the Website and captures, without limitation, consumers' routing, addressing, and signaling information. The Tracking Software collects and transmits information about Website visitors so that Defendant and its advertising and analytics partners can measure user activity, analyze consumer behavior, and facilitate targeted advertising and marketing analytics. Defendant intentionally deploys this Tracking Software on the devices of consumers who access the Website, including consumers located in California. Defendant derives commercial benefit from the collection and analysis of this information, including through targeted advertising, marketing analytics, and the optimization of its sales and marketing operations directed at consumers, including consumers located in California.

14. When a consumer accesses Defendant's Website, the consumer's browser sends a request to Defendant's servers that includes the consumer's Internet Protocol ("IP") address. An IP address allows the website operator to determine the approximate geographic location of the consumer. Defendant therefore receives and processes a consumer's IP address before transmitting the webpage and its embedded Tracking Software to the consumer's browser. After receiving the request containing the IP address, Defendant's servers transmit Website content and embedded Tracking Software to the consumer's device. The Tracking Software then executes within the consumer's browser and captures identifying information from the consumer. Defendant therefore knows the geographic location of the consumer, including when the consumer is located in California, before causing the Tracking Software to execute

within that consumer's device.

15. Defendant retains the technical capability to control access to its Website based on IP addresses or device identifiers and has the ability to restrict or block consumers from accessing the Website using those identifiers. Defendant could prevent California consumers from accessing the Website or from receiving its Tracking Software but has chosen not to do so. Instead, Defendant allows consumers located in California to access the Website and deploys its Tracking Software on those consumers' devices when they access the Website.

16. Plaintiff accessed Defendant's Website while physically located in California. During Plaintiff's visit, Defendant's Tracking Software executed within Plaintiff's browser and captured Plaintiff's routing, addressing, and signaling information. Defendant transmitted and caused the Tracking Software to execute on Plaintiff's device while knowing that Plaintiff was located in California based on his IP address.

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including Plaintiff's access to the Website from this District and Defendant's collection, use, and transmission of Plaintiff's data in connection with that activity. Venue is also proper under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant is subject to personal jurisdiction in this District and therefore resides here for venue purposes.

## PARTIES

18. Plaintiff Lawrence Schallert is an individual, citizen, and resident of California.

19. Defendant Laird Superfood, Inc. is a corporation formed under the laws of Nevada and maintains its principal place of business at 5303 Spine Road, Suite 204, Boulder, Colorado 80301.

20. Plaintiff alleges the fictitiously named defendants captioned above as Does 1 through 25, inclusive, and each of them, were in some manner responsible or legally liable for the actions, damages, events, transactions, and circumstances alleged herein. The true names and capacities of such fictitiously named defendants, whether individual, corporate, associate, or otherwise are presently unknown to Plaintiff, and Plaintiff will amend this First Amended Complaint to assert the true names and capacities of such fictitiously named defendants when they have been ascertained. For convenience, each reference herein to the named Defendant shall also refer to the Doe defendants.

## FACTUAL ALLEGATIONS

### A. *Defendant Secretly Embedded The Tracking Software into Its Website.*

21. When an individual visits a website, that visitor reasonably expects that the communication occurs between the individual and the website operator. The individual's browser sends a request to the website's servers asking for a particular webpage, and the servers respond by delivering the requested content. This exchange ordinarily involves only the limited technical information necessary to route the request and display the webpage.

22. Defendant altered that basic communication process. Rather than allowing individuals to communicate privately with its Website, Defendant intentionally embedded and deployed Tracking Software on the Website provided by TikTok, Meta, Microsoft, Google, Adobe, Snap, and LiveRamp, among numerous others.[1]

[1] While Plaintiff's investigation is necessarily ongoing, he has, to date, identified no less than 40 tracking technologies on the Website, belonging to: Acxiom; Adobe; AdSense; Amazon Web Services; AppLovin; AWIN; Axel Springer; Black Crow AI; Big Sur AI; ByteDance; Centro; ContentSquare; exelate; Google Analytics; Hotjar; Intelligems; Klaviyo; LiveIntent; LiveRamp; Lotame; Meta; Microsoft Advertising; Nielsen Online; Pinterest; PostPilot; Rebuy Engine; Shopify; SiteScout; Snap; Social Snowball; Superfiliate; TapAd; TikTok; X (Twitter); Yahoo; and Yotpo.

23. The Tracking Software includes tracking pixels, cookies, scripts, and related embedded code designed to monitor individuals and capture information about their interactions with the Website, which is then transmitted to third parties.

24. Tracking pixels are small pieces of code embedded in a webpage that automatically activate when the page loads. When triggered, the pixel causes the individual's browser to send information about the individual's activity to the entity that operates the pixel.

25. Cookies are small files placed in an individual's browser that assign identifiers to the individual's device. Some cookies, known as first-party cookies, may be used by a website operator to support basic site functions such as remembering visitor preferences or maintaining a shopping cart. The Tracking Software deployed by Defendant, however, included ***third-party*** tracking cookies that assign persistent identifiers enabling advertising and analytics platforms to recognize the same individual across multiple pages, browsing sessions, and even across entirely different websites.

26. Other forms of Tracking Software include scripts that execute directly within the individual's browser and record the individual's activity during the browsing session, such as the pages viewed, links clicked, and other interactions with the Website.

27. These technologies operate automatically and invisibly. When a webpage loads, the Tracking Software activates without any action by the individual. Visitors do not need to click on anything, submit a form, or otherwise provide personal information for the Tracking Software to begin operating.

28. Once activated, the Tracking Software captures information from the individual's device. This information includes routing, addressing, and signaling data associated with the individual's electronic communications with the Website—data that identifies the source and context of the communication and enables the individual's activity to be recognized and linked across multiple interactions.

29. In practical terms, the Tracking Software captures and transmits information such as: (i) the specific page and resource addresses requested by the individual from the Website, including URL paths and parameters identifying the particular content being accessed; (ii) referrer and source fields indicating how the individual arrived at the Website and the prior webpage or channel that directed the request; (iii) browser- and device-signaling fields describing the individual's client environment, including browser type and version, operating system, language and locale settings, time zone, screen resolution and rendering characteristics, and related device attributes capable of functioning as fingerprint-like identifiers; and (iv) unique request identifiers, session identifiers, and timestamps generated during the browsing session that allow multiple page requests to be grouped together and attributed to the same device or individual over time.

30. These signals function as the digital addressing and routing information of the communication. They identify the source and context of the individual's request and allow the individual's activity to be linked across pages, sessions, and devices. When combined with persistent identifiers deployed through the Tracking Software, these signals enable companies operating the Tracking Software to recognize the same individual across multiple websites and online services, facilitating cross-site tracking of the individual's online activity.

31. Defendant programmed the Website so that these visitor-identifying signals would be captured and transmitted to third parties while the individual was interacting with the Website, transforming what should have been a private interaction between a visitor and a website into a stream of surveillance data shared with outside entities without consent.

32. Defendant does not capture and transmit these signals to third-party advertising and analytics platforms in order to deliver the webpage requested by the visitor. The Website could be displayed to visitors without transmitting this information to third parties. Instead, Defendant collects and transmits these signals so

that advertising and analytics platforms can determine who is on the other side of the screen and associate the visitor's activity with an identifiable consumer profile. The commercial value of these signals lies in their ability to enable identification, cross-site tracking, and behavioral profiling of the visitor across browsing sessions and websites.

**B. *The Digital Surveillance Ecosystem.***

33. The Tracking Software embedded in Defendant's Website is not required to display webpage content to visitors. The Website would function normally without these surveillance tools.

34. Instead, the Tracking Software serves a different purpose: to convert ordinary Website visits into commercially valuable behavioral data.

35. When the Tracking Software captures information about an individual's activity, that information is transmitted to advertising platforms, analytics companies, and marketing services.

36. These companies collect browsing data from millions of websites and combine it with information gathered from mobile applications, advertising networks, and commercial databases.

37. The resulting data is used to construct behavioral profiles of internet users—profiles that may contain detailed information about a person's interests, purchasing behavior, lifestyle choices, and other inferred personal attributes.

38. The value of these profiles lies in their ability to identify or distinguish individual users and associate their online activity with persistent identifiers that follow them across the internet.

39. Through this system, often described as "surveillance advertising," companies transform ordinary browsing activity into a commercial asset that can be analyzed, monetized, and exploited.

40. A central component of this surveillance ecosystem is the network of companies known as "data brokers."

41. Data brokers collect information from advertising platforms, tracking technologies, mobile applications, and other digital sources in order to assemble detailed profiles of individuals.

42. The Tracking Software embedded in Defendant's Website feeds data directly into this ecosystem. Information captured from an individual's interaction with the Website is transmitted to advertising and analytics platforms and incorporated into broader identity profiles maintained by data brokers.

43. Once incorporated into such profiles, information about an individual's interaction with Defendant's Website may be combined with data obtained from countless other sources.

44. Data brokers monetize this information by selling or licensing access to these profiles to advertisers, financial institutions, analytics firms, and other entities seeking to analyze or influence consumer behavior.

45. The consumer data captured through Defendant's Tracking Software is routinely used within the digital advertising ecosystem to construct behavioral and demographic profiles of individuals. Regulators and policymakers have recognized that such profiles may be used not only to target advertising but also to shape the prices and offers presented to consumers.

46. In 2025, for example, the Federal Trade Commission reported that retailers and intermediary firms may use personal data, including location information, demographics, browsing patterns, and behavioral signals, to set individualized prices or promotions for different consumers.[2] When Defendant transmitted Plaintiff's identifying browsing signals to advertising and analytics platforms, that information entered the broader profiling ecosystem used by advertising networks and data brokers

[2] U.S. FTC, *FTC Surveillance Pricing Study Indicates Wide Range of Personal Data Used to Set Individualized Consumer Prices* (Jan. 17, 2025), available at https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (last visited March 11, 2026).

and became available for incorporation into identity profiles used in such downstream commercial practices.

47. Indeed, data brokers openly market the ability to convert ordinary web activity into intimate, individualized profiles. The CEO of the world's largest data broker recently bragged about the staggering extent to which data brokers secretly track internet users:

> [W]e know who she is, what she watches, what she reads, and who she lives with . . . Through the power of connected identity, we also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. . . . We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation.[3]

### C. *Downstream Access to and Misuse of Data.*

48. The consequences of this surveillance extend far beyond advertising.

49. Once visitor-identifying signals are linked to a broker-maintained identity profile, the data becomes portable: it can be sold, licensed, queried, or otherwise disclosed to a wide range of third parties and repurposed outside the context in which it was collected.

50. Government agencies have recognized that the digital advertising industry produces vast databases containing detailed information about individuals' movements, interests, and activities.

51. According to the Brennan Center for Justice:

> [D]ata brokers have sold personal information to predatory loan companies, stalkers, and scammers, as well as to political consultants . . . that can use data to send voters disinformation and attempt to skew electoral outcomes. Data brokers also sell data to foreign actors whose

[3] Lucas Ropek, *Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users* (Mar. 15, 2025), available at https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last visited March 11, 2026).

> uses of the information are not constrained by U.S. law. And . . . law enforcement and other government agencies (including state and local law enforcement, the FBI, the IRS, the Drug Enforcement Administration, the Department of Defense, and the Department of Homeland Security) have secretly been paying data brokers to access vast databases of personal information, including geolocation data, without any warrant, court order, or even subpoena.[4]

52. Indeed, internal government records have revealed that U.S. Customs and Border Protection ("CBP"), a component of the Department of Homeland Security, purchased data derived from the online advertising industry in order to track targeted individuals over time. Immigration and Customs Enforcement ("ICE") has similarly purchased tools derived from the advertising technology ecosystem capable of monitoring the movements of individuals and has expressed interest in acquiring additional "Ad Tech" data for investigative use.[5]

53. The information used in these investigations was derived from the same advertising technology infrastructure that collects and transmits data about individuals whenever tracking software is embedded in websites, including the types of Tracking Software deployed on Defendant's Website.

54. And because government agencies can obtain this data through commercial channels rather than traditional surveillance mechanisms, it can be purchased from data providers without a warrant, subpoena, or court order.

---

[4] Emile Ayoub and Elizabeth Goitein, *Closing the Data Broker Loophole* (Feb. 13, 2024), available at https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last visited March 11, 2026).

[5] Joseph Cox, *CBP Tapped Into the Online Advertising Ecosystem To Track Peoples' Movements* (Mar. 3, 2026), available at https://www.404media.co/cbp-tapped-into-the-online-advertising-ecosystem-to-track-peoples-movements/ (last visited March 11, 2026); Lena Cohen and Hudson Hongo, *The Government Uses Targeted Advertising to Track Your Location. Here's What We Need to Do.* (Mar. 5, 2026), available at https://www.eff.org/deeplinks/2026/03/targeted-advertising-gives-your-location-government-just-ask-cbp (last visited March 11, 2026).

55. Moreover, many advertising and analytics platforms that collect information about website visitors operate globally and routinely transfer user data across national borders.

56. Regulators and policymakers have raised significant concerns about the privacy and security risks created by these global data flows, particularly where behavioral and location data collected through digital advertising technologies may be stored or processed in foreign countries of concern.[6]

57. For example, in 2025, European privacy regulators imposed a €530 million fine on TikTok after determining that the company unlawfully transferred personal data of users to China without appropriate safeguards.[7]

58. Policymakers in the United States have likewise raised concerns that data collected through social media and advertising platforms, including TikTok, may be accessible to China, potentially exposing sensitive data about users to foreign state actors.[8]

59. These concerns are directly relevant here. One of the tracking platforms whose technology was embedded in Defendant's Website was TikTok, meaning that information captured from visitors to Defendant's Website, including Plaintiff, was

---

[6] In April 2025, the U.S. Department of Justice implemented the Data Security Program which identified China as a "country of concern." U.S. DOJ, *Justice Department Implements Critical National Security Program to Protect Americans' Sensitive Data from Foreign Adversaries* (Apr. 11, 2025), available at https://www.justice.gov/opa/pr/justice-department-implements-critical-national-security-program-protect-americans-sensitive (last visited March 11, 2026); *see also* 28 C.F.R. §§ 202.208, 202.601.

[7] *Irish Data Protection Commission fines TikTok €530 million and orders corrective measures following Inquiry into transfers of EEA User Data to China* (May 2, 2025), available at https://www.dataprotection.ie/en/news-media/latest-news/irish-data-protection-commission-fines-tiktok-eu530-million-and-orders-corrective-measures-following (last visited March 11, 2026).

[8] Cong. Rsch. Serv., *TikTok: Recent Data Privacy and National Security Concerns*, CRS Insight No. IN12131 (Mar. 29, 2023), available at https://www.congress.gov/crs-product/IN12131 (last visited March 11, 2026).

transmitted to an entity whose data practices have drawn significant regulatory and national-security scrutiny worldwide.

60. By transmitting Plaintiff's identifying information into this digital surveillance ecosystem without consent, Defendant exposed that information to the same infrastructure that scholars, regulators, and policymakers have warned can aggregate, analyze, and redistribute sensitive user data across numerous entities.

61. The resulting risk is not abstract: once exported into this ecosystem, information about Plaintiff may be retained, combined with other datasets, and used for purposes far removed from the reason Plaintiff accessed the Website, creating an enduring risk that Plaintiff's personal information will be exploited long after the Website visit ended.

**D. *Defendant Deployed The Tracking Software Against Plaintiff.***

62. Defendant operates the Website, through which Defendant markets and sells health and wellness products directly to consumers. The Website contains product pages, recipes, ingredient descriptions, and marketing materials relating to nutrition, health, and wellness practices.

63. To support its marketing and advertising operations, Defendant embedded the Tracking Software described above within the Website's code. When an individual accesses the Website, the individual's browser sends a request to Defendant's servers asking for webpage content. Defendant configured the Website so that, when this request occurs, the Tracking Software activates automatically within the individual's browser.

64. Once activated, the Tracking Software captures routing, addressing, and signaling information associated with the individual's communications with the Website. The Tracking Software records the individual's interaction with the Website, including without limitation, the pages requested, the resources loaded, and the individual's navigation through the Website, and transmits that information to

Defendant and to third-party advertising, analytics, and marketing platforms operating within the digital surveillance ecosystem.

65. The information captured by the Tracking Software is particularly sensitive in the context of Defendant's Website. Defendant markets and sells products focused on health, nutrition, and wellness. Individuals visiting the Website may browse pages relating to functional ingredients, recipes, and other topics associated with personal health. Interactions with these pages can reveal highly sensitive health-related information, including an individual's dietary restrictions, nutritional needs, potential medical conditions, and personal health goals. By capturing and transmitting information concerning an individual's interactions with the Website, the Tracking Software collects data capable of exposing intimate details about an individual's personal habits and health concerns.

66. On or about April 2, 2025, Plaintiff visited Defendant's Website while physically located in California using a device and web browser operating in California. Plaintiff visited the Website to view information concerning Defendant's products and related nutrition and wellness content. At the time of his visit, Plaintiff was not aware that the Website contained embedded tracking technologies that would capture and transmit information concerning his communications with the Website to third-party advertising and analytics platforms. Plaintiff reasonably understood that his interaction with the Website would occur between his device and Defendant as the Website operator and did not expect that information generated through those communications would be disclosed to unrelated third parties.

67. When Plaintiff's browser requested and loaded webpages from the Website, Defendant's Tracking Software executed within Plaintiff's browser on Plaintiff's device in California. Through that execution, the Tracking Software captured routing, addressing, and signaling information generated from Plaintiff's device during Plaintiff's communications with the Website. The captured information

reflected the pages Plaintiff accessed and his interactions with the Website and enabled third parties to associate that activity with Plaintiff's device and browser.

68. Defendant transmitted this information to third-party advertising and analytics platforms without Plaintiff's knowledge or consent. Because the Tracking Software executed within Plaintiff's browser while Plaintiff's device was located in California, the routing, addressing, and signaling information associated with Plaintiff's communications with the Website was generated and captured from Plaintiff's device in California. Through the operation of the Tracking Software, Defendant converted Plaintiff's private interaction with the Website into a trackable record linked to persistent identifiers associated with Plaintiff's device and browser.

69. Those persistent identifiers allow companies operating the tracking technologies to recognize the same individual across multiple browsing sessions and across different websites, enabling cross-site tracking and the creation of behavioral profiles within the digital surveillance ecosystem. As a result of Defendant's conduct, Plaintiff lost control over how his identifying information is collected, analyzed, and disseminated, and faces an ongoing risk that the information extracted from his Website visit will be retained, aggregated with other datasets, and used for purposes far removed from the reason Plaintiff visited the Website.

70. Defendant's deployment of the Tracking Software intruded upon Plaintiff's private affairs in a manner that a reasonable person would find highly offensive. What should have been a private exchange between Plaintiff and Defendant's Website was instead intercepted and disclosed to third-party advertising, analytics, and marketing platforms without Plaintiff's consent. By capturing the routing, addressing, and signaling information associated with Plaintiff's communications with the Website and transmitting that information to external entities for profiling and commercial exploitation, Defendant converted Plaintiff's private browsing activity into data distributed throughout the digital advertising ecosystem.

71. Defendant's conduct has caused and continues to cause concrete injury to Plaintiff and other similarly situated Website visitors. Through the Tracking Software embedded in the Website, Defendant converted Plaintiff's private interaction with the Website into a trackable record linked to persistent identifiers associated with Plaintiff. Plaintiff's interactions with the Website were thereby transformed into data capable of being associated with behavioral profiles used within the digital surveillance ecosystem.

72. As a result, Plaintiff lost control over how his identifying information is collected, analyzed, and disseminated, and Plaintiff faces an ongoing risk that the information extracted from Plaintiff's Website visit will be retained, aggregated with other data sources, and used for purposes far removed from the reason Plaintiff visited the Website.

## CLASS ACTION ALLEGATIONS

73. **Class Definition.** Plaintiff brings this action as a class action lawsuit on behalf of himself and a class of all others similarly situated (the "Class"), defined as follows:

> **All persons located in California whose routing, addressing, or signaling information was captured through Defendant's Tracking Software while visiting Defendant's Website during the applicable limitations period.**

74. Excluded from the Class are: (i) any Judge or Magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

75. Plaintiff reserves the right to amend the class definition as discovery proceeds and the Court's rulings warrant.

76. **Rule 23 Reference.** Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

77. **Numerosity.** The Class is so numerous that joinder of all members would be impracticable. Defendant's Website is a publicly accessible commercial website used by thousands of consumers in California. The Tracking Software operates automatically during visits to the Website and captures the same categories of routing, addressing, and signaling information from individuals' devices. The Class therefore includes thousands of individuals whose identities can be ascertained through Defendant's Website records, tracking logs, and data maintained by its advertising and analytics partners.

78. **Commonality.** Questions of law and fact are common to the claims of Plaintiff and the Class and are capable of resolution through common proof. These common questions include, but are not limited to, the following:

a. Whether Defendant deployed Tracking Software on the Website;

b. Whether the Tracking Software captured routing, addressing, and signaling information associated with individuals' communications with the Website;

c. Whether the Tracking Software constitutes a "trap and trace device or process" within the meaning of Cal. Penal Code § 638.50(c);

d. Whether Defendant installed or used a trap and trace device without obtaining the consent required by Cal. Penal Code § 638.51;

e. Whether Defendant knowingly accessed and used data from individuals' devices without permission in violation of Cal. Penal Code § 502;

f. Whether Defendant's conduct constituted an intrusion upon the private affairs of Plaintiff and Class members;

g. Whether Defendant's conduct constituted a serious invasion of privacy under Article I, Section 1 of the California Constitution;

h. Whether Defendant's conduct constituted unlawful or unfair business practices in violation of Cal. Bus. & Prof. Code § 17200;

i. Whether Defendant's conduct was willful or intentional; and

j. The proper measure of statutory damages, restitution, and injunctive relief.

79. **Predominance.** These common questions predominate over any questions affecting only individual members of the Class. Defendant's liability arises from its uniform deployment of Tracking Software on the Website and the standardized manner in which that software captures and transmits routing, addressing, and signaling information from visitors' devices. Whether Defendant installed or used a trap and trace device, accessed data without permission, and invaded the privacy of Website visitors can be determined through common evidence, including Defendant's Website code, tracking implementations, and communications with its advertising and analytics partners. Individualized inquiries are not necessary because the challenged conduct operated automatically and uniformly whenever individuals accessed the Website.

80. **Typicality.** Plaintiff's claims are typical of those of the Class. Like every Class member, Plaintiff visited Defendant's Website while located in California and had routing, addressing, and signaling information captured through Defendant's Tracking Software. Plaintiff's claims arise from the same course of conduct and rest on the same legal theories as the claims of the Class.

81. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with those of other Class members, and Plaintiff has retained counsel experienced in litigating complex privacy and class action matters. Plaintiff has no interests antagonistic to the Class.

82. **Superiority.** A class action is superior to other available methods for

fairly and efficiently adjudicating this controversy. The statutory damages available to individual Class members are relatively modest compared to the costs of individual litigation. Absent a class action, many Class members would have little practical ability to vindicate their rights. Resolving these claims in a single proceeding will conserve judicial resources and promote consistent adjudication.

83. **Injunctive Relief.** Plaintiff seeks injunctive relief appropriate to the Class as a whole. Such relief includes, but is not limited to, orders requiring Defendant to cease the challenged capture and transmission practices, delete information captured or received through the Tracking Software, and take commercially reasonable steps to direct its service providers to do the same to the extent practicable.

84. **Notice.** Plaintiff will propose a plan for providing the best notice practicable under the circumstances to Class members, including individual notice where possible through Defendant's records and other reasonably available means, consistent with Federal Rule of Civil Procedure 23 and due process.

## COUNT I: VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW, CAL. PENAL CODE § 638.51

**(*On Behalf of Plaintiff and the Class*)**

85. Plaintiff and Class members incorporate the foregoing allegations as if fully set forth herein.

86. CIPA prohibits any person from installing or using a trap and trace device without first obtaining consent or a court order. Cal. Penal Code § 638.51(a).

87. CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

88. Defendant installed and used Tracking Software on the Website. The Tracking Software constitutes a "device or process" within the meaning of Cal. Penal

Code § 638.50(c) because it operates during visits to the Website to capture electronic signals associated with individuals' communications with the Website.

89. When an individual accesses the Website, the individual's browser transmits requests to Defendant's servers identifying the specific webpage requested and the context of that request. These requests contain routing, addressing, and signaling information associated with the individual's electronic communications.

90. As alleged herein, Defendant's Tracking Software captures and transmits, among other things, the webpages requested by the individual, referrer and source information identifying how the individual arrived at the Website, browser and device signaling characteristics, persistent identifiers, and unique request and session identifiers and timestamps generated during the communication between the visitor's browser and the Website.

91. This information constitutes routing, addressing, and signaling information reasonably likely to identify the source of an electronic communication within the meaning of Cal. Penal Code § 638.50(c).

92. Defendant configured the Website so that the Tracking Software automatically activates when an individual accesses the Website and captures routing, addressing, and signaling information associated with that individual's electronic communications with the Website.

93. Defendant transmitted this information to third-party advertising, analytics, and marketing platforms operating within the digital surveillance ecosystem while the communication between the consumer and the Website was occurring.

94. Defendant installed and used this trap and trace device or process without first obtaining a court order authorizing the installation or use of such a device or process.

95. On or about April 2, 2025, Plaintiff accessed Defendant's Website while located in California. During Plaintiff's visit, Defendant caused the Tracking Software to execute within Plaintiff's browser and capture and transmit routing, addressing, and

signaling information associated with Plaintiff's communications with the Website to third-party advertising and analytics platforms.

96. Defendant deployed the Tracking Software in the same manner for other California visitors to the Website during the class period, causing the same capture and transmission of routing, addressing, and signaling information associated with their communications with the Website.

97. Neither Plaintiff nor the Class provided prior express consent to Defendant's installation or use of the Tracking Software to capture and transmit their routing, addressing, and signaling information.

98. By installing and using a trap and trace device or process without the consent or court order required by CIPA, Defendant violated Cal. Penal Code § 638.51.

99. Plaintiff and Class members suffered injury because Defendant captured and transmitted their visitor-identifying routing, addressing, and signaling information without consent. That capture and third-party disclosure constitute a concrete invasion of privacy because they interfere with Plaintiff's and Class members' private affairs and disclose their personal information to third parties for de-anonymization, cross-site tracking, and behavioral profiling—conduct that a reasonable person would find highly offensive when imposed without consent.

100. Pursuant to Cal. Penal Code § 637.2, Plaintiff and the Class seek statutory damages, injunctive relief, and such other relief as the Court deems proper.

## COUNT II: VIOLATIONS OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT CAL. PENAL CODE § 502

**(*On Behalf of Plaintiff and the Class*)**

101. Plaintiff and Class members incorporate the foregoing allegations as if fully set forth herein.

102. California's Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, prohibits, among other things, knowingly

accessing, and without permission taking, copying, or making use of data from a computer, computer system, or computer network, and knowingly accessing, and without permission adding, altering, damaging, deleting, or destroying data residing on a computer, computer system, or computer network. Cal. Penal Code § 502(c)(1), (2), and (4).

103. For purposes of bringing a civil action under the statute, a person who causes the access of a computer, computer system, or computer network from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction where the access occurred. Cal. Penal Code § 502.

104. Defendant violated CDAFA by knowingly and without permission accessing Plaintiff's and Class members' computers and browser environments and taking, copying, and making use of data generated by those devices.

105. As alleged above, Defendant embedded Tracking Software into the code of the Website. When Plaintiff and Class members accessed the Website, this code automatically executed within their web browsers and caused their devices to transmit information to Defendant's servers and to third-party advertising and analytics servers.

106. Through this process, Defendant caused Plaintiff's and Class members' computers to generate and transmit data stored on or generated by their devices, including routing, addressing, and signaling information associated with Plaintiff's and Class members' communications with the Website, browser and device metadata, identifiers associated with Plaintiff's and Class members' browser environments, and other information reflecting their interactions with Defendant's Website.

107. Defendant executed this code on Plaintiff's and Class members' devices without their knowledge or authorization and for purposes unrelated to delivering the webpages those users requested.

108. The execution of this Tracking Software caused Plaintiff's and Class members' devices to produce output from the logical, memory, and network resources of their computers and browsers within the meaning of Cal. Penal Code § 502(b)(1).

109. The Tracking Software also caused persistent identifiers and tracking files, including cookies and related tracking identifiers, to be written to and stored within Plaintiff's and Class members' browser environments. These files enabled Defendant and its third-party partners to recognize Plaintiff's and Class members' devices across browsing sessions and across other websites that incorporate the same tracking technologies.

110. By causing code to execute within Plaintiff's and Class members' browsers, extracting data from their devices, and placing persistent identifiers and tracking files within their browser storage, Defendant knowingly accessed Plaintiff's and Class members' computers without permission and took, copied, and made use of data from their computers in violation of Cal. Penal Code §§ 502(c)(1) and 502(c)(2), and further added to and altered data residing on Plaintiff's and Class members' devices by writing persistent tracking identifiers to their browser environments in violation of Cal. Penal Code § 502(c)(4).

111. Defendant's conduct caused damage and loss within the meaning of Cal. Penal Code § 502(e). The Tracking Software consumed computing resources on Plaintiff's and Class members' devices, including processing power, memory resources, and network bandwidth, and caused their browsers to generate additional outbound communications to third-party tracking servers that were unrelated to the webpages requested by the user.

112. Defendant's tracking code also altered data stored on Plaintiff's and Class members' devices by placing persistent tracking identifiers and related tracking files within browser storage and altering how those browsers communicated with external servers during subsequent browsing activity.

113. As a result of Defendant's conduct, Plaintiff's and Class members' computer resources were used without authorization to generate and transmit data to third-party tracking platforms and to store persistent tracking identifiers on their devices for Defendant's advertising, analytics, and commercial purposes.

114. Defendant engaged in this conduct knowingly and for the purpose of obtaining data and commercial value from Plaintiff's and Class members' devices and browsing activity.

115. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and the Class suffered damage and loss within the meaning of Cal. Penal Code § 502(e), including the unauthorized use of their devices' computing resources, the alteration of data stored within their browser environments, and the generation of additional network communications caused by Defendant's tracking code.

116. Plaintiff and the Class seek compensatory damages, injunctive relief, and all other relief authorized by Cal. Penal Code § 502(e).

## COUNT III: INVASION OF PRIVACY

**(*On Behalf of Plaintiff and the Class*)**

117. Plaintiff and Class members incorporate the foregoing allegations as if fully set forth herein.

118. Article I, Section 1 of the California Constitution guarantees a right to privacy.

119. The constitutional right to privacy protects individuals from the unauthorized collection, use, and dissemination of their personal information by both governmental and private actors.

120. Plaintiff and Class members possess legally protected privacy interests in the confidentiality of their electronic communications and in the personal information generated through their interactions with websites, including routing, addressing, and signaling information associated with their online activity and communications with Defendant's Website.

121. These communications include requests transmitted from an individual's browser to Defendant's servers identifying the specific webpages requested, the context of the request, and the routing and signaling information associated with that communication between the visitor's device and the Website.

122. Plaintiff and Class members also possess legally protected privacy interests in information reflecting their dietary concerns and health-related inquiries. Interactions with Defendant's Website, including visits to product pages, ingredient descriptions, and health-related content, can reveal highly sensitive personal information concerning an individual's health conditions, dietary restrictions, nutritional needs, and related private matters.

123. Plaintiff and Class members had a reasonable expectation that their communications with Defendant's Website would not be captured, intercepted, or transmitted to third-party advertising, analytics, and marketing platforms without their knowledge or consent.

124. Defendant nonetheless embedded Tracking Software into the Website that automatically captures and transmits information associated with individuals' communications with the Website, including the pages visited, the content viewed, and the technical identifiers associated with the individual's device and browser.

125. Through this Tracking Software, Defendant transmitted information concerning Plaintiff's and Class members' interactions with the Website to third-party advertising, analytics, and marketing platforms for advertising, analytics, and profiling purposes without their knowledge or consent.

126. Defendant's conduct constituted a serious invasion of privacy. By covertly intercepting and transmitting information concerning Plaintiff's and Class members' communications with the Website, including information capable of revealing sensitive health-related concerns, Defendant exposed their private browsing activity to a network of third-party advertising and analytics companies operating within the digital surveillance ecosystem.

127. Defendant's conduct was intentional and undertaken for Defendant's commercial benefit and the benefit of its advertising and analytics partners.

128. As a direct and proximate result of Defendant's invasion of privacy, Plaintiff and Class members suffered harm, including the unauthorized disclosure of private information and the loss of control over the confidentiality and dissemination of their personal data and online communications.

**COUNT IV: INTRUSION UPON SECLUSION**

**(*On Behalf of Plaintiff and the Class*)**

129. Plaintiff and Class members incorporate the foregoing allegations as if fully set forth herein.

130. Under California law, intrusion upon seclusion occurs when a defendant intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

131. Plaintiff and Class members had a reasonable expectation of privacy in their communications with Defendant's Website and in the personal information generated through their interactions with the Website and their browsing activity on that Website.

132. Those communications included requests transmitted from individuals' browsers to Defendant's servers identifying the specific webpages requested, the context of those requests, and the routing, addressing, and signaling information associated with those electronic communications.

133. Plaintiff and Class members also had a reasonable expectation of privacy in information revealing their dietary needs and health-related concerns, which could reasonably be inferred from the webpages viewed and content accessed on Defendant's Website.

134. Defendant intentionally intruded upon Plaintiff's and Class members' private affairs by embedding Tracking Software within the Website that captured and recorded information concerning individuals' communications with the Website.

135. This Tracking Software captured information reflecting the pages requested, the resources loaded, the context of the request, and persistent identifiers associated with the individual's device and browser during the visitor's interaction with the Website.

136. Defendant transmitted this information to third-party advertising, analytics, and marketing platforms for advertising, analytics, and profiling purposes without the knowledge or consent of Plaintiff and Class members.

137. Through these practices, Defendant enabled third parties to observe, monitor, and analyze Plaintiff's and Class members' browsing activity and interactions with the Website.

138. Defendant's intrusion into Plaintiff's and Class members' private affairs would be highly offensive to a reasonable person.

139. A reasonable person would find it highly offensive for a commercial website to secretly deploy tracking technologies that capture and transmit information concerning visitors' communications with the website, including information capable of revealing sensitive health-related interests, to third-party advertising and analytics platforms without the visitors' knowledge or consent.

140. Defendant's conduct was willful and intentional and carried out with conscious disregard for the privacy rights of Plaintiff and Class members. Defendant knowingly deployed Tracking Software designed to capture and transmit information concerning visitors' communications with the Website and used that information to collect valuable consumer data for advertising, analytics, and other commercial purposes. Defendant's conduct therefore constituted malice, oppression, and/or fraud within the meaning of Cal. Civ. Code § 3294, warranting punitive damages.

141. As a direct and proximate result of Defendant's intrusion upon seclusion, Plaintiff and Class members suffered harm, including an invasion of privacy and the unauthorized capture and disclosure of their personal information.

## COUNT V: UNFAIR COMPETITION CAL. BUS. & PROF. CODE § 17200 *et seq.*

**(*On Behalf of Plaintiff and the Class*)**

142. Plaintiff and Class members incorporate the foregoing allegations as if fully set forth herein.

143. California's Unfair Competition Law ("UCL") prohibits any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code § 17200.

144. Defendant's conduct was unlawful because it engaged in business acts and practices that violated multiple state statutes and common law duties, including CIPA, Cal. Penal Code § 638.51; CDAFA, Cal. Penal Code § 502; the common law tort of intrusion upon seclusion; and the right to privacy guaranteed by Article I, Section 1 of the California Constitution.

145. Defendant's conduct was also unfair. Defendant covertly embedded Tracking Software into the Website that extracted identifying information from visitors' devices and transmitted that information to third-party advertising and analytics platforms without visitors' knowledge or consent. These practices are unethical, substantially injurious to consumers, and contrary to established public policy protecting the privacy of electronic communications and personal data.

146. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. During visits to the Website, Defendant captured and extracted identifying information from Plaintiff's and Class members' devices, browsers, and Website interactions.

147. Plaintiff and Class members possess a legally protected interest in controlling the collection, use, and dissemination of this information. Personal browsing and identity data such as the information captured through Defendant's Tracking Software possess recognized economic value. Companies in the digital advertising and data brokerage industries collect, aggregate, and license such information to construct behavioral profiles used for advertising, analytics, and

commercial decision-making. The existence of these markets demonstrates that the data extracted from Plaintiff's and Class members' devices and online activity constitutes valuable personal information.

148. By intercepting and transmitting this identifying information to third-party tracking platforms without authorization, Defendant deprived Plaintiff and Class members of control over valuable personal data.

149. Once disseminated into advertising and data broker networks, such information can be copied, retained, aggregated with other datasets, and incorporated into identity profiles used throughout the digital advertising ecosystem. The unauthorized disclosure of Plaintiff's and Class members' information therefore destroyed their exclusive control over that data and diminished its economic value.

150. As a result of Defendant's conduct, Plaintiff and Class members lost control over valuable personal data constituting property within the meaning of the UCL and the exclusive ability to control how that information is collected, used, and disclosed.

151. Had Plaintiff and Class members known that Defendant would intercept their communications with the Website and transmit identifying information concerning their browsing activity to third-party tracking platforms, they would not have visited the Website.

152. Plaintiff and Class members therefore seek restitution, injunctive relief, and all other relief authorized by Cal. Bus. & Prof. Code §§ 17203 and 17204. Plaintiff further seeks attorneys' fees, costs of suit, and expenses pursuant to Cal. Code of Civ. Proc. § 1021.5 and any other applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in his favor and against Defendant, and grant the following relief:

1. Certify this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative, and appoint Plaintiff's counsel as Class Counsel;

2. Declare that Defendant's conduct, as alleged herein, violates applicable California law, including CIPA, CDAFA, the California constitutional right to privacy, and the common law prohibition against intrusion upon seclusion;

3. Award statutory damages to Plaintiff and the Class pursuant to Cal. Penal Code § 637.2 for Defendant's violations of CIPA;

4. Award compensatory damages to Plaintiff and the Class pursuant to Cal. Penal Code § 502(e) and other applicable law;

5. Award general and special damages to Plaintiff and the Class in an amount to be proven at trial for Defendant's invasion of privacy and intrusion upon seclusion;

6. Award punitive and exemplary damages to the extent permitted by law;

7. Award restitution and other equitable relief authorized by Cal. Bus. & Prof. Code §§ 17203 and 17204;

8. Issue appropriate declaratory and injunctive relief, including orders requiring Defendant to cease the challenged capture, interception, transmission, retention, and use of information through the Tracking Software; to delete any information previously captured or received through the Tracking Software to the extent practicable; and to take commercially reasonable steps to direct its service providers and third-party partners to do the same to the extent Defendant has the authority or ability to do so;

9. Award Plaintiff and the Class their reasonable attorneys' fees and costs to the extent authorized by applicable law;

10. Award pre-judgment and post-judgment interest as permitted by law; and

11. Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury for all issues triable to a jury.

DATED: March 11, 2026

TAULER SMITH LLP

*/s/ Jaymie Parkkinen*
Jaymie Parkkinen

*Attorneys for Plaintiff*
*Lawrence Schallert*